```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

William Calvin Conkle,            :

     Plaintiff,                 :

  v.                               :     Case No. 2:14-cv-0180

                                     :     JUDGE EDMUND A. SARGUS, JR.
Commissioner of Social Security,       Magistrate Judge Kemp

     Defendant.                 :


## REPORT AND RECOMMENDATION

### I. Introduction

Plaintiff, William Calvin Conkle, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income. Those applications were filed on June 15, 2010, and alleged that Plaintiff became disabled on July 12, 2007.

After initial administrative denials of his claim, Plaintiff was given a video hearing before an Administrative Law Judge on October 25, 2012. In a decision dated November 2, 2012, the ALJ denied benefits. That became the Commissioner's final decision on December 24, 2013, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on May 8, 2014. Plaintiff filed his statement of specific errors on July 7, 2014, to which the Commissioner responded on October 27, 2014. Plaintiff filed a reply brief on November 17, 2014, and the case is now ready to decide.

### II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 42 years old at the time of the administrative hearing and who has a high school education along with some college, testified as follows.  His testimony appears at pages 44-55 of the administrative record.

The first issue discussed in Plaintiff's testimony was his back impairment.  He described discomfort whether he was sitting, standing, or getting up from a seated position.  He could sit for ten or fifteen minutes and stand for twenty before having pain.  Lying down was his most comfortable position.  He also experienced numbness in his hands, which affected his ability to pick up and use objects or open packages.  He took Vicodin three times daily.

Plaintiff also suffered from bipolar disorder and depression.  He experienced racing thoughts which affected his ability to concentrate, and also depressive episodes which made it hard for him to go to work.  His depressive episodes occurred at least monthly and lasted for weeks at a time.  He had these problems despite taking his medication.

After Plaintiff stopped working, he began attending Hocking College, and then went to the Cincinnati College of Mortuary Science, obtaining an associate's degree.  He had not passed his national boards, however.  He did work at a funeral home in 2011 and 2012, but either quit or was let go because he missed two consecutive weeks of work due to depression.  Prior to that, he would miss a day every other week.

Plaintiff had recently been married.  He and his wife went out occasionally but mostly stayed home and talked or watched television.  He had never been hospitalized for psychological reasons.  He identified his most significant problems as being unable to work when depressed and getting easily frustrated by changes in the workplace.

### III.  The Medical Records

The medical records in this case are found beginning on page 320 of the administrative record. The pertinent records - those which relate to the claims raised by Plaintiff in the Statement of Errors - can be summarized as follows.

Plaintiff was treated for depression as early as 2006. In 2009, he reported mood swings and racing thoughts. He had a diagnosis of bipolar disorder at that time and was taking medication for it. He had some psychotherapy sessions in 2009 as well. In 2010, after moving to Cincinnati, Plaintiff reported to the VA hospital that he had stopped taking his lithium. His GAF was rated at 55 at that time. (Tr. 407). He moved back to the Athens area shortly thereafter, resumed treatment with the VA, and reported improvement of his symptoms with Depakote. (Tr. 854-55). However, he also said that he had "crashed" for several months in the Spring of 2011 after having discontinued his medications in order to complete mortuary school. (Tr. 915-17). The importance of counseling was stressed to him in addition to medication management. He was still reporting mood swings in 2012 as well as anxiety in social situations and difficulty focusing. He was restarted on lithium at that time. (Tr. 1068-69).

Dr. Goudy, a psychologist, performed a psychological evaluation on October 11, 2012. He interviewed Plaintiff and administered two test instruments. Plaintiff reported chronic anxiety as well as periodic manic episodes during which he engaged in impulsive and damaging behaviors. He also described serious depressive episodes with hypersomnia. Dr. Goudy noted excessive fidgeting during the interview as well as a marked impairment in recent memory. The two test instruments indicated severe levels of depression and anxiety. Dr. Goudy diagnosed bipolar disorder and generalized anxiety disorder and rated Plaintiff's GAF at 50-55. He assessed the "B" criteria under the

mental impairment listings and concluded that Plaintiff had mild impairment in his activities of daily living, mild to moderate impairment in his social functioning, and moderate impairment in concentration, persistence, and pace.  He had not experienced episodes of decompensation.  (Tr. 1140-45).  Dr. Goudy then completed a residual functional capacity evaluation form indicating that Plaintiff was moderately impaired in his ability to deal with the public, interact with supervisors, function independently, maintain attention and concentration, behave in an emotionally stable manner, relate predictably in social situations, and complete a workday and work week without interruption from psychologically-based symptoms.  He found a marked impairment, however, in the ability to deal with job stress.  (Tr. 1148-50).

    Plaintiff continued to receive psychiatric treatment at the VA clinic.  A progress note from February, 2013, indicated current active depression and a possible borderline personality disorder.  His GAF at that time was rated at 41.  (Tr. 1252-58).  He participated in counseling sessions during 2013 as well.  In addition, state agency reviewers expressed some opinions about Plaintiff's impairments.  From a psychological viewpoint, Dr. Haskins said that Plaintiff did have difficulties with attention and concentration and would need to work in a situation where there was no fast pace, no need for sustained close attention, and no stringent production requirements or frequent work changes.  (Tr. 67).  That opinion was rendered in July, 2010.  Dr. Waggoner reviewed the issue in October, 2010, and concurred.  (Tr. 90).  Neither of them had the benefit of Dr. Goudy's assessment because it took place more than two years later, nor did either of them see the VA treatment notes from 2011, 2012, or 2013.

IV.  <u>The Vocational Testimony</u>

Dr. John Finch was the vocational expert in this case. His testimony begins on page 56 of the administrative record.

Dr. Finch testified that Plaintiff's prior work as a funeral home attendant was medium and skilled. His work as an automobile salesman was light and skilled, and a job he held as a route salesman was medium and semi-skilled.

Dr. Finch was then asked some questions about a hypothetical person who had Plaintiff's educational and work history. That person could work at the light exertional level and could occasionally climb ramps, stairs, ladders, ropes, and scaffolds. He or she could also understand, remember, follow, and carry out simple routine tasks in a static environment with few changes as long as there was no fast-paced production pace or stringent production quotas. The person could also have occasional and superficial contact with others. Dr. Finch testified that someone with those limitations could not do any of Plaintiff's past work.

The ALJ next asked if someone with those restrictions could do other jobs. In response, Dr. Finch identified light, unskilled positions like sorter, folder, and tagger. When asked if someone who was off task for 15% of the workday or who would miss two to three days of work per month could do those or any other jobs, Dr. Finch said no. Lastly, he testified that ongoing problems with supervisors would make employment "difficult."

V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 19-33 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2015. Second, Plaintiff had engaged in substantial gainful activity after his alleged onset date, doing

so in the third and fourth quarters of 2011 and the first and second quarters of 2012.  Next, he found that Plaintiff suffered from severe impairments including bilateral carpal tunnel syndrome; disc protrusion at L4-L5; loss of disc height at T11-T12; degenerative changes at L4-L5 and L5-S1; a history of alcohol dependence; and bipolar disorder.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional level but that he was limited to frequent (as opposed to continuous) fingering bilaterally.  Also, he could only occasionally climb ramps and stairs, ladders, ropes, or scaffolds, and could understand, remember, follow, and carry out simple routine tasks in a static environment with few changes as long as there was no fast-paced production pace or stringent production quotas.  Plaintiff could also have occasional and superficial contact with others.  The ALJ found that, with these restrictions, Plaintiff could not perform his past relevant work but that he could do those jobs identified by Dr. Finch.  Finally, the ALJ determined that those jobs existed in significant numbers in the regional, State, and national economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

## VI. Plaintiff's Statement of Specific Errors

In his statement of specific errors, Plaintiff raises a single issue, which he states this way: "The ALJ failed to properly evaluate and weigh the medical opinions of record and he erred when he based his RFC on his own lay opinion rather than the supported medical opinions contained in the record." Statement of Errors, Doc. 15, at 11.  The Court analyzes this

issue under the following standard.

   <u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

   Plaintiff's argument can be summarized as follows.  The ALJ did not directly adopt any specific medical opinion as to Plaintiff's mental capacity, and did not even indicate the weight he assigned to the various opinions, including those of the state agency reviewers and of Dr. Goudy.  Rather, the ALJ simply interpreted the records and test results on his own, thus violating the precept that "substitution of an ALJ's lay opinion

-7-

for the opinion of qualified medical professionals is a practice that is widely prohibited." Statement of Errors, at 13. Plaintiff also faults the ALJ's reasoning for rejecting all of Dr. Goudy's conclusions about functional limitations based on the way in which the form he completed defined terms such as "moderate." Overall, according to Plaintiff, substantial evidence did not support the ultimate residual functional capacity finding which the ALJ made. He augments his argument in the reply brief with many additional citations to the record; because the reply both exceeds the Court's page limitations and reads more like an initial statement of errors than a reply, the Court will largely disregard it in determining the issue presented.

The Commissioner makes several responses to Plaintiff's argument. Included among them are a review of records which support the ALJ's finding that, at least through sometime in 2010, Plaintiff was not reporting disabling symptoms to mental health providers, and a defense of the ALJ's rejection of portions of Dr. Goudy's opinions either due to the form he was required to use or because those opinions found no support in Dr. Goudy's own observations and data. The Commissioner also disputes the notion that the ALJ improperly substituted his own medical opinion for that of medical professionals, noting that this Court has held that an ALJ is not always required to obtain a medical source opinion before developing a claimant's residual functional capacity. Steadman v. Astrue, 2011 WL 6415508, *9 (S.D.Ohio Dec. 21, 2011).

Here is what the ALJ said about his mental residual functional capacity finding. He first discussed Plaintiff's limitations when determining that Plaintiff did not have an impairment of Listing severity. There, the ALJ determined that Plaintiff had mild restrictions in his activities of daily

living, evidenced by the fact that he was able to work for a portion of the period for which he claimed disability and that he was able to perform most activities of daily living without difficulty, something that, according to the ALJ, Dr. Goudy agreed with.  He next determined that Plaintiff had moderate difficulties in social functioning; again, Plaintiff was able to go to school and to work, he presented to examiners as cooperative, and he got married, all of which indicate an acceptable level of social interaction.  Third, the ALJ concluded that Plaintiff also had moderate difficulties with regard to concentration, persistence, and pace, a finding also based on Dr. Goudy's opinion about how well Plaintiff could function when he was not experiencing a manic state, as well as the evidence about Plaintiff's being able to work and go to school.  (Tr. 23-24).

When the ALJ discussed these issues in the context of his residual functional capacity finding, he noted that there were few records of treatment for mental health issues in 2008, that medication (particularly lithium) seemed to be effective in 2009 in controlling some of his symptoms, that Plaintiff worked at Subway for a period of time in 2009, that Plaintiff attended mental health appointments inconsistently during that year, and that by early 2010 he was doing well in school and was mentally stable.  The ALJ included a less detailed summary of mental health treatment records from 2011 and 2012, many of which did indicate some exacerbation of symptoms, and then devoted a considerable amount of discussion to Dr. Goudy's report.

That discussion, which appears at Tr. 30-31, includes the following pertinent points.  The ALJ noted that had Dr. Goudy used the term "moderate" as normally defined (that is, that a moderate limitation was not, of itself, work-preclusive), he would have given Dr. Goudy's decision significant weight, but the form suggested that a moderate impairment translated into the inability to perform the function in question for up to 20% of

the workday, and, as the ALJ noted, "[a] person who cannot work for 20% of the work day cannot work." (Tr. 30). There appeared to be nowhere on the form for a particular work ability to be rated as moderate in the traditional sense; it was either slight or work-preclusive. The ALJ then reasoned that if Dr. Goudy actually meant that each time he checked a "moderate" box on the form, he was stating that Plaintiff could not do that activity in a competitive work setting, that opinion was not consistent with Dr. Goudy's observations at the examination, with Plaintiff's school attendance, with his work activity, and with the other treatment records which the ALJ previously discussed. He did, however, give significant weight to Dr. Goudy's narrative opinion concerning the effect of Plaintiff's manic episodes, finding that they caused marked impairments, but he noted that the evidence showed few such episodes overall and none when Plaintiff was compliant with treatment. He nevertheless imposed limitations on Plaintiff's interactions with others and his ability to deal with fast pace in the work environment.

Finally, at Tr. 32, the ALJ discussed, briefly, the state agency reviewers. He explicitly rejected the finding that Plaintiff did not have any severe physical impairments; as far as mental impairments are concerned, he rejected their determination that Plaintiff could deal satisfactorily with detailed instructions and could have unlimited interaction with others, based on additional evidence that they did not review and based on Dr. Goudy's opinion. Thus, it is clear that the ALJ's mental residual functional capacity finding was not directly adopted from any single opinion, but was an amalgam of the findings of the two state agency reviewers and those of Dr. Goudy, influenced by the treatment records from the VA and by Plaintiff's activities during the years in question. The issue is whether the ALJ acted improperly when he made that finding.

The Court does not so conclude. The Commissioner is correct

that an ALJ does not need to adopt the precise restrictions contained in any particular medical opinion when formulating a residual functional capacity finding. "Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." Poe v. Comm'r of Social Security, 342 Fed.Appx. 149, 157 (6th Cir. Aug. 18, 2009). "The residual functional capacity determination is expressly reserved for the Commissioner." Ford v. Comm'r of Social Security, 114 Fed.Appx. 194, 198 (6th Cir. Nov. 10, 2004). As this Court has said, an "ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions," in arriving at a residual functional capacity finding. Davis v. Comm'r of Social Security, 2013 WL 6008697, *9 (S.D. Ohio Nov. 13, 2013), adopted and affirmed 2013 WL 6632657 (S.D. Ohio Dec. 17, 2013). Where there is enough evidence in the record to support the ALJ's conclusions as to various aspects of the residual functional capacity finding, those conclusions are not reversible simply because they are not drawn word for word from specific medical opinions in the record. Feigenbaum v. Comm'r of Social Security, 2014 WL 201483 (N.D. Ohio Jan. 17, 2014).

    That is the case here. Contrary to Plaintiff's argument, the ALJ both acknowledged and discussed the opinions of the state agency reviewers. He adopted some of their findings, but modified others in light of additional evidence, including Dr. Goudy's consultative opinion. He provided a rationale for each of his conclusions, citing to the various treatment records and to the fact that, despite his claim of disabling symptoms, Plaintiff was able to attend classes, earn a degree, and work for substantial periods of time after his alleged onset date. Plaintiff does not dispute the existence of any of this evidence, and a reasonable person could have reached the same conclusion as

did the ALJ based on that evidence. Plaintiff's assertion that the ALJ simply had no evidence on which to base his mental residual functional capacity finding, or that he did not provide an adequate explanation for how he arrived at his conclusions on that issue, is simply belied by the record.

Plaintiff has not argued that the medical evidence was so incomplete that the ALJ breached his duty to develop the record by not ordering a separate mental consultative examination. He also has not argued that the ALJ did not give enough weight to Dr. Goudy's opinion; Dr. Goudy, after all, was a one-time examiner and not a treating source, and the ALJ did give significant weight to some of his conclusions and explained why he did not accept others. What he argues, in essence, is that when different sources express different opinions about a claimant's mental limitations, the ALJ's residual functional capacity finding must, for each separate limitation found, mirror one of the opinions of record. As the above discussion shows, that is not the law. Because the ALJ's residual functional capacity finding was not the product of the ALJ's own interpretation of test results, but represented a balancing of competing opinions based on substantial evidence, the ALJ's decision should be affirmed.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner of Social Security.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).

A judge of this Court shall make a <u>de novo</u> determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

    The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

                                          <u>/s/ Terence P. Kemp</u>
                                          United States Magistrate Judge